JOHN M'VICKAR, ARCHIBALD PHILIPS, and WILLIAM STEWART, } *Appellants,*

v.　　　　*against*

OLIVER WOLCOTT, ARCHIBALD GRACIE, MOSES ROGERS, and WILLIAM W. WOOLSEY, } *Respondents.*

An appeal lies from an order of the court of chancery refusing to dissolve an injunction, and awarding costs against the defendants.

Where a suit at law was brought by A. against B. and they agreed to submit the same to the arbitration of persons mutually chosen, who decided in favour of A. it is not a sufficient ground for maintaining a bill in chancery, and continuing an injunction, that A. was the agent of C. for whose use the suit at law was prosecuted, as B. might make the same defence against A. as if the suit had been brought by C. and where a defendant neglects to set up matters in his defence at law, either before arbitrators or a jury, he cannot afterwards make such matters the basis of a suit in equity, unless there was some *accident* or *fraud* of which the party could not avail himself at law.

A court of chancery will aid a defendant in obtaining a discovery before a trial at law, but not afterwards.

IN *June*, 1803, *Jesse Hopkins*, of the state of *Connecticut*, being in the island of *Barbadoes*, made a contract with *George Cruden*, an agent for the supply of the *British* troops in the *West-Indies*, for the delivery of certain cargoes of live cattle and flour. About four cargoes a month were to be shipped from *New-haven* for the *British* head-quarters in the *West-Indies*, which were at *Barbadoes*. *Cruden* agreed to advance about one-half of the amount, or 1,000 dollars on each cargo ; and on the 29th *June*, 1803, wrote to his agents in *New-York*, the appellants, trading under the firm of *John M'Vickar & Co.* informing them of the contract he had made with *Hopkins*, and that he had authorised him to draw on them for the 1,000 dollars advance on each cargo shipped, on sending to them a copy of the bill of lading, and the policy of insurance, by way of security in case of the non-arrival of the cargo. The advances were to be made in 30 days after the documents mentioned as security were lodged with *M'Vickar & Co.* In a postscript to the same letter, *Cruden* agreed to dispense with the transfer of the policy of insurance by *Hopkins*, and that *M'Vickar & Co.* might receive other good and satisfactory security, for the money advanced

IN ERROR.
••••••••
ALBANY,
March, 1808.

M'Vickar
v.
Wolcott.

by them, on the cargoes actually shipped, and duly consigned to *Cruden*.

*Hopkins* afterwards agreed with the appellants, instead of delivering the policies of insurance, that the respondents and *James Watson*, since deceased, who were then partners, under the firm of *Oliver Wolcott & Co.* should become sureties to the appellants, for the delivery of the cargoes. Accordingly, on the 20th *September*, 1803, an agreement was entered into between *Oliver Wolcott & Co.* in behalf of *Hopkins*, on the one part, and *John M'Vickar & Co.* in behalf of *George Cruden*, of the other part, by which, after reciting the agreement between *Hopkins* and *Cruden*, *Oliver Wolcott & Co.* engage, on receiving the acceptance of *M'Vickar & Co.* of the drafts of *Hopkins*, for 1,000 dollars, at 30 days on account of the cargoes of cattle shipped, and consigned to *Cruden*, to reimburse *M'Vickar & Co.* each and every advance so made, on whatever cargoes of cattle, as should not arrive to the hands of *Cruden*, within 30 days after advice of the same by either party, together with the charge of interest and commission, by *M'Vickar & Co.* on the amount of such advances. This agreement was signed by the appellants and respondents, in their proper names.

*Jesse Hopkins* having entered into a partnership with *Asa* and *Daniel Hopkins*, under the firm of *Jesse Hopkins & Co.* they commenced the shipment of cagoes of cattle, which were consigned to *Cruden*, at *Barbadoes*, or whatever island in the *West-Indies* should become *British* head-quarters, and to proceed from thence to any other island, if required by the consignee. *Four* of the cargoes so shipped, gave rise to the present controversy ; more particularly three cargoes, shipped in the months of *September*, *October* and *December*, 1803, and on which *Hopkins* drew bills on the appellants, for 1,000 dollars each, and which were accepted by them.

IN ERROR.
ALBANY,
March, 1808.
M'Vickar
v.
Wolcott.

Upon the acceptance of each bill, *Oliver Wolcott & Co.* gave to the appellants a receipt ; and all the bills so accepted were paid to *Oliver Wolcott & Co.*

The three cargoes above mentioned, on account of the vessels falling to *leeward*, did not arrive at *Barbadoes ;* but reached some of the leeward islands in the *West-Indies*, where they were sold, on account of the shippers. These cargoes, however, were tendered to the agents of *Cruden*, at the different islands where they arrived, but were refused.

By a letter, dated the 15th *July*, 1804, *Cruden* gave notice to the appellants, that the three cargoes of cattle had not arrived at *Barbadoes ;* and that he would not pay or allow the appellants the advances made upon them, but that they must look to the security they had taken, for their reimbursement. This letter was received on the 5th *September*, 1804, and was the first notice which the appellants had of the non-arrival of the three cargoes of cattle at *Barbadoes.* 'About the 1st *October*, 1804, (*John M'Vickar* having been absent from *New-York*, at the time the letter was received, and for about three weeks after,) notice was given by the appellants to the respondents, of the non-arrival of the cargoes ; and they were requested to reimburse the amount of the advances, with the interest and commission.

After repeated applications, the respondents gave their final answer, that they would not make the reimbursements demanded, on which a suit was commenced against them by the appellants, in the supreme court, to recover the amount. By consent of the parties, in *December*, 1806, the cause was referred to three referees, and the usual rule entered for that purpose. ' The cause was fully heard and discussed before the referees, two of whom, on the 28th *January*, 1807, made a report in favour of the appellants, for 3,740 dollars ; the other referee did not concur in the report. Soon after, and

before any judgment could be obtained on the report, the respondents filed their bill in the court of chancery, against the appellants ; and on the 4th *May*, 1807, an in- junction was awarded, to restrain the appellants from prosecuting their suit at law, until the further order of the court of chancery.

The bill stated the contract between *Hopkins* and *Cruden*, which it charged, was not formally reduced to writing ; but the principal conditions of it were ex- pressed in two letters from *Cruden* to *Hopkins*, dated at *Barbadoes*, the 24th *June*, 1803, which were set forth. In these letters, among other things, *Cruden* says : " every cargo, on its arrival at *Barbadoes*, or any other island where I have an agent resident, shall be examined by that agent on my part, and any creditable and re- spectable person that may be appointed on your part ; and whatever weight, on an average, they may agree upon, as the real weight of the cattle, to the best of their judgment, that weight I agree to receive the cattle at, and to account to you accordingly," &c. " If it shall, at any time, happen, that the cattle should, from encoun- tering hardships on the passage, from being shipped in bad order, or from any other cause or accident, arrive in bad condition, &c. so as to render them unfit for the use of the troops, it must remain with me, or my agents, in all such cases, to reject the cattle, *in toto*, or only to allow such a price for them, as may be agreed on between you or your agents, as sellers, and me or mine, as buyers," &c. The bill then charged, that by the actual agreement, verbally made between *Hopkins* and *Cruden*, cargoes which might fall to the leeward of *Barbadoes*, and arrive at other islands where *Cruden* had agents resident, should be received by those agents, and paid for by him ; that *Cruden*, after a full knowledge that the three cargoes had fallen to leeward, and of the facts before stated, as to the shipments, advances and security

M'Vickar
v.
Wolcott.

given by the respondents, made voluntary remittances to
*Hopkins*, to the amount of 18,000 dollars, and upwards.
The bill further charged, that the appellants had been
reimbursed by *Cruden*, for their advances on the three
cargoes of cattle; that *Jesse Hopkins*, and *Hopkins &*
*Co.* had become insolvent; that the suit at law was pro-
secuted by the appellants for the benefit of *Cruden*, who,
with *Jesse Hopkins* and *Daniel Hopkins*, were made de-
fendants.   The bill prayed for a discovery and for relief,
and a perpetual injunction, to restrain the prosecution of
the suit at law.

     The appellants, in their answer, denied all knowledge
or information of the nature and terms of the contract
between *Hopkins* and *Cruden*, except what was derived
from the letter of *Cruden* to them, on the 29th *June*,
1803; that they were ignorant of the remittances made
by *Cruden* to *Hopkins*, and *Hopkins & Co.* They denied
that *Hopkins & Co.* were insolvent, though they were
somewhat embarrassed in 1804; but afterwards continu-
ed their ordinary business, and paid their debts; that the
appellants were authorised by *Cruden* to draw on *Phyn,*
*Inglis & Co.* of *London*, to the amount of 10,000 dollars
per month, to reimburse their advances made on account
of *Cruden*; that they could not draw for more than that
sum in any one month, or make up in one month, what
their drafts in another month fell short of that sum.
That they drew bills on *Phyn, Inglis & Co.* for all their
advances, including the advances made on the bills
drawn by *Hopkins*, on the three cargoes of cattle; that
the bills of *Hopkins* were not presented for acceptance,
until after the appellants had, in each instance, accepted
bills drawn by *Cruden*, for more than the 10,000 dollars
in each month; that *Phyn, Inglis & Co.* refused to ac-
cept their bills, to the amount of 40,000 dollars, on the
ground, that the appellants had drawn beyond the pre-
scribed credit of 10,000 dollars per month; that these

bills being protested for non-acceptance and non-pay-
ment, were afterwards paid by *Phyn, Inglis & Co.* for
the honour of the appellants, as drawers ; that they
are still liable to *Phyn, Inglis & Co.* for the amount so
paid for their honour, and that their credit on *Phyn,
Inglis & Co.* on account of *Cruden*, was withdrawn on
the 24th *January*, 1804, and the accounts between the
appellants and *Phyn, Inglis & Co.* were unsettled.
The appellants further stated, that *Cruden* had constantly
refused to allow them the advances made to *Hopkins*, on
the bills in question, and that *Cruden* was still indebted
to them, in a large amount ; and they denied, that the
suit at law was instituted or prosecuted, for the benefit
of *Cruden*, or with his knowledge or concurrence ; but
was solely for their own benefit.

*Cruden* did not put in an answer, though measures
were pursued to have the bill taken *pro confesso* against
him, for a default of appearance. On the filing the an-
swer of the appellants, a motion was made in the court
below, in *October*, 1807, to dissolve the injunction ; and
the bill and answer were read, and the motion argued by
counsel. On the 30th *October*, 1807, the chancellor
ordered that the injunction should be continued ; that the
appellants should take nothing by their motion, and pay
the costs of resisting it. From this order they appealed
to this court.

The reasons for the order were thus assigned by

THE CHANCELLOR. The complainants had, in the
first instance, made a case which induced the court to
grant an injunction ; and a motion was made to dis-
solve it, on the grounds, among others :

1. That the defendants, *M'Vickar & Co.* had an-
swered fully, and denied the equity of the bill.

2. That the matter on which the bill was founded, was
available in a defence at law ; that the complainants

might have been admitted to show it in their defence before the referees; and that therefore, they ought now to be concluded.

Preliminary to the examination of the first point, it may be well to remark, that its decision must, in a great measure, depend upon the forms of the court.

I take it to be a settled rule, that where a bill is filed against several defendants, for a joint cause of action, and an injunction issued in consequence thereof, that the complainant is entitled to retain it, if the merits would warrant its issuing in the first instance, until the answers of all the defendants are in.

There are many exceptions to that rule, and its application to each particular case, must depend upon the circumstances attending it.

Here the complainants made a case by their bill, showing that the advance in question, was made under the influence, and in pursuance of a pre-existing contract between *Cruden* and *Hopkins*, undoubtedly in the capacity of agents, and in supposed conformity to the instructions of *Cruden*, their principal; for the bill stated, (and the fact was not denied by the defendants' answer, the defendants disavowing any knowledge of the terms of the original contract,) that *M'Vickar & Co.* by its terms, were to make such advances, as agents for *Cruden.*

The defendants' answer admitted, that the sole inducement to the advance was those instructions, and to put the matter beyond all possible doubt, the contract now the subject of controversy between the parties, expressly purports to have been made by *Oliver Wolcott & Co.* in behalf of *Jesse Hopkins*, and *John M'Vickar & Co.* in behalf of *George Cruden;* and recites so much of the contract, as to identify it, to all the intents which had a bearing on the motion, with the one stated in the complainants' bill.

The advance was then an incident of the original contract, made by *M'Vickar & Co.* in the character of agents, with the eventual replacing of which the defendants had no connexion nor any interest ; and of consequence, the nature extent and modification of the credit given to *Cruden*, by the house of *Phyn, Inglis & Co.* or *he exact form in which *Cruden* was to respond to the defendants, must be laid out of the case, as matters to which the complainants were neither parties nor privies.

The only questions were ; had the complainants shown that the defendant *Cruden* was an essential party ? and could his answer have either a direct or remote influence on the case of the present defendants ?

*Cruden* was not only an essential, but in my view, the principal party. His contract was the subject of controversy ; his advance the subject of claim by the complainants ; and whatever complexion the cause might take in its progress, in that stage of it, and with relation to that question, I thought it a clear case.

As to the 2d point.

The defendants at law, I rather thought, could not there have availed themselves of the defence they set up before me ; and so thinking, I decided that point according to my impressions, at the time, leaving it open for a further discussion upon a final hearing, after all the parties should be brought in, if it should be then made a point. The complainants alleged in their bill, that they were unable, for want of sufficient proofs, or any confession or discovery, to show several facts material to their defence, and which they particularized, without a discovery, by the defendants, which has always been deemed a good reason for a resort to chancery.

I was, therefore, of opinion, that the injunction ought to be retained ; and that the defendants should take nothing by their motion, and should pay the costs of resisting it.

IN ERROR.
••••••••
ALBANY,
March, 1808.

M'Vickar
v.
Wolcott.

*Sanford,* for the appellants. The object of the bill, in the court below, was to obtain relief against the suit at, law, by a perpetual injunction. The answer denies all equity.

A preliminary objection may be raised by the respondents, that no appeal will lie from the order of the chancellor, continuing the injunction : but after what has been said in the case of the *Trustees of Huntington* and others v. *Nicoll* and others,* it is unnecessary to enter into a particular examination of this objection. It would be very grievous and oppressive, in many cases, to stay a party who had obtained a judgment at law, indefinitely, until a final decree in the court of chancery.

The chancellor refused to dissolve the injunction, because *Cruden* and *Hopkins* had not answered ; but they are strangers to the suit at law. The judgment was obtained by *M'Vickar & Co.* only. It will be easy to stop proceedings at law, by making strangers, residing in remote places, parties to a bill for an injunction, if it cannot be dissolved until all the parties have answered. It is true, the bill against those defendants who do not answer, may be taken *pro confesso.* Still the hardship and inconvenience are great. Even if the answers of *Cruden* and *Hopkins* had been put in, they could not be used against *M'Vickar & Co.* their co-defendants.† Their not answering, therefore, can be no reason for continuing the injunction.

The letter of *Cruden* to *M'Vickar & Co.* is the basis of the agreement ; the contract between *Wolcott & Co.* and *M'Vickar & Co.* is founded on this letter. *Hopkins* shipped the cattle, and drew bills, which were accepted by *M'Vickar & Co.* and paid to *Wolcott & Co.* who gave a receipt, that the acceptance was according to the agreement. The three cargoes of cattle never arrived at *Barbadoes,* which was always the *British* head-quar-

\* 3 *Johns. Rep.*
566.

† *Mitford,* 152.
2 *Vernon,* 380.
3 *P. Wms.* 311.

IN ERROR.
•••••••
ALBANY,
March, 1808.

M'Vickar
v.
Wolcott.

ters, and where they ought to have arrived, pursuant to the contract with *Cruden*. As *Wolcott & Co.* were bound to refund the money, in case the cargoes did not arrive, the *casus fœderis* happened, and the defendants were, by law, bound to refund. The appellants did, in fact, prevail at law. No question of *law*, is, therefore, to be raised or discussed.

The *equity* set up in the bill is, that *Cruden*, by his contract with *Hopkins*, was bound to receive the cattle at any of the *leeward* islands at which they arrived, and where *Cruden* had agents ; and that the cattle did arrive at a leeward island, where there was an agent of *Cruden*. *Barbadoes* is the most *windward* island.

The contract, set forth in the bill, between *Cruden* and *Hopkins*, is very different from the contract between the appellants and respondents, which speaks only of the event of the arrival of the cattle at *Barbadoes :* But it is stated that the suit is for the benefit of *Cruden*. Still both the grounds of equity, namely, that *Cruden* was bound to receive the cattle at the place where they arrived, and that the suit is for the benefit of *Cruden*, are denied by the appellants, in their answer in the court below.

Admitting, however, the contract between *Cruden* and *Hopkins* to be as stated by the respondents, it cannot affect the contract between the appellants and respondents, which is *res inter alios acta*, and wholly independent of the other. It is a personal contract, binding only on the parties who signed it. As the appellants were not parties, nor privies to the former contract, they are not chargeable with a knowledge of it. That contract is also stated to have been by *parol ;* and *res inter alios gestæt nocere non debent.*

Should it be said that *Hopkins* is insolvent, and that if the respondents are compelled to pay the money to the appellants, they could not recover it from *Hopkins ;*

it may be answered, that this would be the misfortune of the respondents, but it furnishes no ground of equitable relief against this contract. If the cargoes had sunk at sea, the respondents must have been liable, whatever might have been the situation of *Hopkins*. The money was advanced by the appellants to the respondents; and for aught that appears, it is still in their hands. If they have paid it over to *Hopkins*, they should have taken care to secure themselves against their ultimate liability on their contract with the appellants.

It will be said, that the appellants have received the money which they now claim of the respondents. It is true, they received bills on *London*, for the amount, in the course of business. *Cruden* had a fund in *London*, and he was to draw on his correspondent in *New-York*, who was to draw on the person holding the fund in *London*. The bills received, were to the use of *Cruden*. Suppose the cargoes had been lost by the perils of the sea, would the respondents be allowed to make this objection to an action against them, on their contract with the appellants; as the *cattle* did not arrive, it is the same as if they were lost. If the bills were not paid, the appellants could not have recourse to *Cruden*. The appellants were instructed to take security for their advances, and they made them at their own peril. The appellants had no authority to draw for more than 10,000 dollars per month; and the bills drawn for the cargoes in question, were an excess beyond that sum. These bills were protested; and *Phyn, Inglis & Co.* paid them, *supra* protest, for the honour of the drawers, who are, therefore, liable to them for the amount.

The fund in *London* belonged to *Cruden*, and was under his control; *Cruden* refuses to allow the appellants the amount of these advances; and *Phyn, Inglis & Co.* will of course require the appellants to pay the amount. It

follows, that the appellants are without remedy, if they cannot recover the amount of the respondents.

The appellants merely ask to have the injunction dissolved ; it cannot affect the rights of the respondents, if, on a final hearing, they shall be able to establish them. Where the answer denies all the equity of the bill, it is a rule of course, to dissolve the injunction.

Again, the respondents voluntarily consented to refer the cause to the decision of arbitrators ; and are, therefore, now entitled to much less favour, after the report or decision of those arbitrators.

*S. M. Hopkins*, and *Van Vechten*, for the respondents. From the nature and effect of the transactions in this case, it is manifest, that the advances made by the appellants to *Hopkins*, were out of the funds of *Cruden ;* they were made in pursuance of the agreement between *Cruden* and *Hopkins*, by the agents of the former to the agents of the latter. The contract between the appellants and respondents is collateral to, and dependent on the contract between *Cruden* and *Hopkins*, and is to be governed by the terms and effect of the original transaction. The appellants, in fact, advanced the money of *Cruden ;* it was an order from him to his agents, to pay money to the respondents, on his account, and to charge it to him. By receiving the money, the respondents did not become indebted to the appellants, but to *Cruden*, the principal. If then *Hopkins* is not responsible to *Cruden*, for the money advanced, the respondents are not liable to the appellants.

Again, there is more equity in the case of the respondents, as mere sureties. *Cruden*, long after the advances were made, had property belonging to *Hopkins* in his hands, which he ought to have applied to his own indemnity ; and as he did not secure himself out of those funds,

*IN ERROR.*
.......
ALBANY,
March, 1808.
M'Vickar
v.
Wolcott.
but remitted them to *Hopkins*, the respondents ought to be exonerated.

On these grounds, the respondents filed a bill in the court of chancery, for a discovery and an account; for if it should appear, from the account between *Cruden* and *Hopkins*, that nothing was due to *Cruden*, or if, on a final account between the appellants and *Cruden*, nothing should be due to the latter, then there could be no claim against the respondents. That *Cruden* was the principal, in the whole transaction, and the respondents merely sureties for *Hopkins*, is clear from the facts in the case. The suit at law was for his benefit; he was a material party; and the respondents ought to retain the injunction until his answer is put in, and the whole equity of the bill denied.

It is a mistaken notion, that the respondents were bound to reimburse the appellants personally. The court, in construing the agreement, will look rather to the nature of the transactions between the parties, than to the words of the contract, in order to discover the scope and intent of the agreement.* The liability of one party cannot be increased by the acts or conduct of the other party. The appellants, by drawing, or overdrawing bills, cannot alter the responsibility of the respondents; nor can *Cruden*, by refusing to receive the cargoes, change that responsibility.

*Hopkins*, by the contract with *Cruden*, had an election to land the cargoes to be shipped, either at *Barbadoes*, or at any leeward island, where *Cruden* had an agent. The performance of either part of the alternative, was sufficient.† If *Hopkins* went to *Barbadoes*, it was enough; he was not bound to carry the cargoes further.

Again, the respondents have a right to insist on the practical construction given to this contract by *Cruden* himself, who received and paid for one of the cargoes, that arrived at a leeward island.

* *Ludlow* v. *Simond*, 2 *Caines's Cases in Error*, 43.

† *Co. Lit.* 145. a. 4 *Burr.* 2052. 2856. *Roll. Abr.* 446.

IN ERROR.

ALBANY,
March, 1808.

M'Vickar
v.
Wolcott.

Where a creditor has an opportunity to reimburse himself, out of the funds of the principal debtor, in his hands, he ought to do it; and if he fails to do so, the surety of such debtor is exonerated.* Here the suretyship was at the commencement of the transactions between *Cruden* and *Hopkins.* Funds were continually coming into the hands of *Cruden*, afterwards, out of which he might have indemnified himself, for any advances, as to the first cargoes which did not arrive; and for that purpose, notice was to be given to *Cruden* of the amount specifically advanced on each cargo which was shipped.

* *Law v. E. I. Company*, 4 *Vesey, jun.* 824.

It is to be observed, also, that eleven months elapsed, after the cargoes were shipped, before *Cruden* directed the appellants to make any demand on the respondents. By this long delay, the respondents lost the opportunity of reimbursing themselves out of any monies of *Hopkins*, which might have come into their hands; all the transactions between him and them having been long before closed. *Cruden* was bound to give notice to the respondents, and to make his demand in a reasonable time.† Whether the respondents did know, or not, of the non-arrival of the cargoes, can make no difference; their responsibility depended on the notice they were to receive from *Cruden*, or the appellants.

† 1 *Roll. Abr.* 463. 469. *Hob.* 51. *Hardres,* 42. *Cro. Jac.* 432.

Until the appellants have actually paid the money out of their own pockets, they can have no equitable claim against the respondents. Admitting that *Phyn, Inglis & Co.* paid the bills for the honour of the drawers, yet it does not appear that the appellants have ever been called upon by *Phyn, Inglis & Co.* for the amount. It has been asked, how are the appellants to get back their money, unless from the respondents? It may be answered, that they have already the money in their hands.

As to the award; if the appellants meant to rely on that as conclusive, it ought to have been pleaded, or if

M'Vickar
v.
Wolcott.

———
\* *Mitford's Plead.* 204. 296. 209.
† 1 *Vesey*, 327. 331. 3 *Atk.* 223.

set forth in the complainant's bill, they should have demurred.\* An award is not more conclusive than a judgment ; and that must be pleaded.† Again, the award was concerning the suit *at law ;* but the suit in chancery is between different parties ; and in which equitable considerations arise which would not be made to appear in a court at law.

*Hoffman,* in reply. The agreement of the 20th *September,* 1803, must be the basis of the decision of the court. All prior parol communications, between *Cruden* and *Hopkins,* or between them and the present parties, are to be disregarded. The written contract alone is to be considered. The appellants had an interest in this contract, and a claim of benefit under it. Much of the argument, therefore, on the other side, becomes inapplicable, if the appellants have an equitable interest in the contract of which they cannot be devested by any acts of *Cruden.* It does not follow, that, because they are the agents of *Cruden,* that they have no interest in the contract ; the agent as well as the principal may have a right, at the same time, in the same contract. As if an agent sells goods, to be paid for on a certain day, the principal cannot receive the money until the agent is first paid for any balance due to him from the principal. Again, suppose the agent makes advances on the credit of his principal, which he is legally bound to refund, but not trusting to that responsibility, the agent also chooses to take security ; the legal responsibility of the principal cannot prevent the agent from resorting to the security he has taken. The rule is the same in equity as in law. No doubt the respondents were agents ; but in their contract with the appellants, they do not bind themselves as agents. Where a person is to be charged as agent, he must subscribe himself as such, otherwise he is personally responsible. The only

exception to the rule, is in favour of the public agents of government.

Suppose the cargoes shipped by *Hopkins* had been lost at sea, would the appellants have a right to resort to the respondents for indemnity, in case of the death or bankruptcy of *Cruden* ? Could the assignees of *Cruden* compel the appellants to give up the contract made with the respondents, until they were first reimbursed for their advances ? If not, then the appellants have an equitable *lien*, as well as a legal claim on the security of the respondents.

But it is said that the appellants are already paid. That is, they are paid out of their own *funds*, or *credit* with *Phyn, Inglis & Co.* who paid the bills for their honour.

Again, the respondents had a complete remedy at law, where they might have set up in their defence, what they now make a ground for relief in equity. A court of equity has no more power than a court of law to correct any errors of the arbitrators. It is, then, merely a bill for the discovery of facts essential to a legal defence. But a bill of discovery, after a verdict, will not be sustained, when the discovery might have been had prior to the verdict. The respondents might have had the benefit of the discovery prayed for, at the hearing before the arbitrators. *Cruden* might have been examined as a witness.

But it is said, that the suit is prosecuted for the benefit of *Cruden ;* and this secret trust is, indeed, the only ground stated in the bill, for granting the injunction ; yet as the answer expressly denied such secret trust, there was no reason for continuing the injunction.

The arbitration was voluntary ; it was not a reference under the statute, but by the consent of the parties ; and the award must be conclusive. Its merits are not to be inquired into by the court, unless fraud or collusion is

*IN ERROR.*

ALBANY,
March, 1808.

M'Vickar
v.
Wolcott.

alleged. The appellants were not bound to plead the award. But it is said that *Cruden* was not bound by the award ; yet if the appellants were his agents, he would be bound ; and if they were not his agents, then he is a perfect stranger to the cause.

VAN NESS, J. Several questions, on the argument of this cause, were presented for our decision ; but as I am of opinion that the appellants have, by their answer, denied the whole equity of the bill, it is unnecessary for me to notice many of them.

A suit was commenced by the appellants, in the supreme court, upon the contract entered into between the present parties, on the 20th *September*, 1803. Issue was joined in the cause, and after being noticed for trial, it was by mutual consent, referred to three persons nominated and elected by the parties.

The referees proceeded to the hearing of the cause ; both parties appeared before them, and after their proofs and allegations had been exhibited, and after a full discussion of the merits, two of them made a report in favour of the appellants.

Soon after the decision of the referees, the present bill was filed, and the appellants were injoined from further proceedings in the suit at law.

Upon the filing of the answer, an application was made to the chancellor, to dissolve the injunction, which was denied ; and his decision on that application, is the subject of the present appeal. This is a summary of the proceedings, before the cause came into this court.

The counsel for the respondents admit, that the suit in the supreme court was not referable under the statute. The submission therefore to the referees, was in the nature of an arbitration, and the report in relation to

the merits of the controversy is final and conclusive between the parties.

Whether the contract of the 20th *September*, 1803, enured exclusively to the benefit of *Cruden*, or whether, in the event of the non-arrival of the cargoes, the appellants acquired a concurrent right with *Cruden*, to resort to that contract, to reimburse their advances, it is not necessary here to decide; for in either case, the injunction ought, in my opinion, to be dissolved.

IN ERROR.
.......
ALBANY,
March, 1808.

M'Vickar
v.
Wolcott.

If the contract was exclusively for the benefit of *Cruden*, although the remedy at law upon it must necessarily be pursued in the name of the appellants, yet the recovery would be for the use of *Cruden*. In that case, the respondents might have availed themselves, at law, of every defence which would have been admissible, provided *Cruden* had himself been a party upon the record; and if the construction of the contract contended for by the respondents be the true one, we are to presume, that such a defence was made and relied upon.

And here I will dispose of another point, as connected with this part of the case. One ground upon which the respondents seek relief against the report of the referees is, that they have not had an opportunity of using the evidence of the trial at law, which *Cruden's* answer to a bill of discovery would have afforded. Granting for a moment, that such answer would have furnished the respondents with a complete defence, still as they omitted to take the necessary steps to possess themselves of that answer, before the trial at law, which they might, and, if they deemed it important, ought to have pursued, they are now too late. I am satisfied, that the appellants, notwithstanding they have answered the bill, are at full liberty to avail themselves of this objection.

If the contract of the 20th *September*, in the event of the non-arrival of the cargoes, was an accumulative remedy for the appellants, to indemnify them for their advances to *Hopkins*, then *Cruden's* answer could not, either in the trial at law, or in the court below, prejudice the rights of the appellants. Whatever, therefore, may be the true construction of the contract, (upon which, for the reason I have mentioned, I give no opinion, though I have formed one,) the result must, in reference to the question now before this court, be the same.

I am of opinion, therefore, that the order for the injunction, ought to be reversed.

SPENCER, J. This appeal is from an order of the court of chancery, continuing an injunction after answer, and directing the payment of costs by the appellants to the respondents, for resisting the motion to dissolve the injunction, issued on filing the bill.

It has been objected preliminarily, that no appeal is maintainable upon an order like the present. The 32d article of the constitution, and the 8th section of the act, regulating proceedings on appeal and error, have been cited. The constitution does not profess to specify any regulations upon the subject; but directs, that a court shall be instituted, for the trial of impeachments and the correction of errors, under the regulations which shall be established by the legislature. The section of the statute referred to, declares that all persons aggrieved by any sentence, judgment, decree or order, of the court of chancery, or court of probate, may appeal from the same, or any part thereof, to this court.

The decision of the chancellor, in denying a dissolution of the injunction, directing it to be retained, and awarding costs against the appellants, brings this case within the terms of the statute. An order of that court has intervened, in relation to which, the appellants are

aggrieved by the payment of costs, if that order is not justified on legal principles.

That orders may be appealed from, it is now too late to controvert; the practice of this court, in hearing such appeals in a variety of cases, has given a construction to the statute not to be shaken. Without undertaking to draw the line between such orders, as may or may not be appealed from, in my opinion, this is an order from which an appeal lies ; in coming to a decision on a motion before the court of chancery, there must necessarily have been an examination into the merits of the case, as disclosed by bill and answer, and the appellants have sustained a *gravamen*, in the payment of costs.

The ground of the opinion of the court below, in ordering the injunction to be retained, was, that *George Cruden* was a principal in the contract between *M'Vickar & Co.* and *Wolcott & Co.* and that *M'Vickar & Co.* were agents merely, having no interest themselves in the contract; on that principle, the injunction was continued, until the coming in of *Cruden's* answer. It becomes necessary to ascertain the relation which the appellants have to *Cruden*, and their rights under the contract with the respondents, taken in connexion with the contract between *Cruden* and *Jesse Hopkins*, and how far forth the hearing before the referees or arbitrators will conclude the respondents.

It is certain, that the letter from *Cruden* to the appellants, of the 29th of *June*, 1803, led to the contract of *September* the 20th, in that year, between these parties. In that respect, the appellants may be considered as the agents of *Cruden*; his directions were pursued in taking the security, and in adjusting the terms of the contract; and in case of the arrival of the cargoes, the appellants had resort for a reimbursement of their advances, to *Cruden* alone. If, however, the cargoes did not arrive, according to the stipulations in the contract, then the

appellants were possessed of a security to them indi-
vidually and specifically, by which they had a right in
their own names, to reclaim from the respondents the
advances they had made under the contract.

The caption of the contract purports, that it was en-
tered into between the respondents, in behalf of *Hopkins*,
and the appellants, in behalf of *Cruden*. This is merely
introductory, and can have no control over the stipula-
tions it may contain, unless there be ambiguity and doubt,
as to the effect of those stipulations. The body of the
contract is explicit; and by it, the respondents undertook
and engaged, on receiving the acceptance of the appel-
lants to *Hopkins'* drafts for 1,000 dollars, at 30 days, on
account of such cargoes of cattle, shipped and consigned
to *Cruden*, to reimburse the appellants, each and every
advance made on whatever cargoes of cattle did not
arrive safe to the hands of *Cruden*, within 30 days from
the advice of the same, by either party.

If the *casus fœderis* happened, nothing could prevent
the appellants from recurring to their remedy, under
the contract; it is true, this money, when recovered,
might enure to the benefit of *Cruden*; and there might be
a state of things in which it would not. If, for instance,
the appellants had not drawn on *Phyn*, *Inglis & Co.* at
all, to reimburse themselves, or if, as is alleged by the
answer, their drafts were protested; in either of these
events, I cannot conceive that any court could devest the
appellants of a security which they had acquired, and
of rights which justice and equity would warrant their
holding.

I may, therefore, conclude, that in some respects, the
appellants were the agents of *Cruden*; and in some re-
spects, they had rights not liable to his control.

The appellants conceiving their right to a reimburse-
ment from the respondents had attached, prosecuted at

IN ERROR.
........
ALBANY,
March, 1808.

M'Vickar
v.
Wolcott.

law; and the cause was referred to three persons mutually agreed upon, not as a case within the provisions of the statute authorising references. Two of the referees reported in favour of the appellants; and to avoid that report, this suit was instituted. The principal grounds of the bill are, that by the actual agreement between *Cruden* and *Hopkins*, cargoes which, by any accident, should fall to the leeward of *Barbadoes*, should be received at any island where *Cruden* had an agent residing. That *Cruden* would cause about 1,000 dollars to be advanced on each cargo, in *America*, through the appellants; and for that purpose, he wrote the letter of the 29th *June*, 1803. That the respondents became *Hopkins*' sureties in lieu of the policies, and the agreement of the 20th *September* was then made. That in *August*, 1803, *Hopkins* began to ship cargoes on the contract, and in that and the two succeeding months, four vessels sailed with cargoes, fell to leeward, but arrived at other *British* islands, where *Cruden* had agents resident. That *Hopkins* made four drafts on the appellants, which were accepted and paid. That it is usual for such vessels to fall to leeward, and that the cargoes were of the description and quality, which *Cruden* was obliged by his contract to receive. That *Cruden* received one of the cargoes at *Antigua*, and thus gave a construction to the contract; but improperly refused the other cargoes. That *Cruden*, with a full knowledge of the facts as to the advances, shipments, arrival and refusal, and of the suretyship of the respondents, made voluntary remittances to *Hopkins*. That the appellants and *Cruden*, during the time that their remittances were making, and until long after *Hopkins*' insolvency, never gave the respondents notice that they were held responsible; and that if timely notice had been given, they might have secured themselves. That the appellants have, in some way, been repaid the advances, and the nature of their credit on *Phyn*, *Inglis*

*& Co.* is stated. That the advances made by the appel-lants, were not on the credit of the respondents, nor charged against them; nor have they relieved *Cruden.* That *Cruden* and *Phyn, Inglis & Co.* were solvent; and that *Hopkins* was in 1804, and yet is insolvent, and that the respondents have no competent security. That the appellants had sued at law, a reference had taken place, and the referees had reported, and that they prosecute for the benefit of *Cruden.* That on the hearing, the re-spondents could not, for want of proof, and of a disco-very from the appellants, show at what time *Cruden* had notice of the advances made by the appellants, or of the non-arrival of the four cargoes; and were unable to prove that such notice existed, previous to the 3d *June,* 1804, though they believe the appellants had the means of showing this; and that the referees, in making up their report, have excluded from their consideration the point arising from the remittances made by *Cruden* to *Hop-kins,* as not being within the cognisance of a court of common law, but exclusively of equitable jurisdiction.

I have been thus minute in detailing the bill, that no part may escape the consideration due to it. It is not material to go minutely into the answer; the ap-pellants deny the existence of the most material facts set up, or declare their ignorance of them. They parti-cularly deny, that they have been reimbursed from *Cruden,* or by their drafts on *Phyn, Inglis & Co,* for the advances they now claim, though they admit that they did draw on *Phyn, Inglis & Co.* for them; but which drafts, owing to their having exceeded the monthly sum they were au-thorised to draw for, have been protested for non-accept-ance and non-payment, and have been eventually paid for the honour of the drawers. They deny that the suit at law was prosecuted for the benefit of *Cruden,* but allege it was for their own benefit, and that they look

alone to the respondents to be reimbursed; and they insist, that the referees did not exclude any point of defence from their consideration, as being of equitable jurisdiction.

Whether the trial before the referees be considered as a trial, on strictly legal principles, or as before arbitrators of the parties' own choosing, it may not be very essential to examine. In either view, it draws after it consequences, which, in my opinion, are decisive in the present case; for it is an undeniable proposition, that a defence which might be made at law, and which a party will either omit or decline to make, cannot be the basis of a suit in equity; unless it be in cases of *fraud*, *accident* or *trust*, peculiarly within the province of a court of equity, or where the jurisdiction of the legal tribunal cannot admit the defence.

In the present case, it was a matter of inquiry, before the referees, whether the cargoes had arrived pursuant to the contract; and whether *Cruden* was, under the contract between him and *Hopkins*, bound to receive the cargoes at any other island than *Barbadoes*, or whatever island might become *British* head-quarters. The referees, in reporting in favour of the respondents, must have decided, either that the cargoes did not arrive at all, or did not arrive at the island contemplated and agreed upon between the parties to the contract. Their decision is final upon this point, and no court of law or equity should disturb it.

There is nothing of a peculiarly equitable jurisdiction, in ascertaining whether the appellants were agents to *Cruden*, and having no rights of their own, distinct from his. This was a proper subject for discussion, even in a court of law; and at law, the beneficial interest of a third person will be regarded and upheld, against even the acts of the trustee. A variety of cases might be mentioned,

*IN ERROR.*
.......
ALBANY,
March, 1808.

M'Vickar
v.
Wolcott.

where this has been done at law ; hence it was a matter which was or might have been brought before the referees, if the respondents were agents without any interest or right in the contract, that *Cruden* made remittances to *Hopkins*, to the fraud and injury of the respondents. It is equally a decisive answer to this ground of equity, that there is no pretence, that the respondents offered evidence to the referees, which could have influenced their decision ; for by their bill they state their inability to do so, for the want of proof, and of discovery from the appellants, as to the time that *Cruden* had notice of the advances made, and the non-arrival of the four cargoes. A court of equity, it is true, is ancillary to a court of law, and would have afforded the respondents its aid in gaining a discovery before trial, but not after ; and it appears to me to be novel and unprecedented, to ask a review of a cause, at law or in equity, because a party has gone to trial without sufficient proof, which, if diligent, he might have obtained. There is another answer to this ground of equity ; it is denied that the referees did exclude this subject from their consideration, on the ground of its being exclusively of equitable jurisdiction.

In short, the only colourable ground of equity in the bill is, that the suit at law is prosecuted for *Cruden's* benefit ; and this is pointedly denied by the answer. It is scarcely necessary to remark, that the answer is to be taken as true, in those parts which are answers to interrogatories, until disproved.

The injunction, then, in my opinion, ought not to have been continued, under any notion that there was an equity stated in the bill, which was not denied ; nor upon the idea that the appellants were agents, and not invested with any rights peculiar to themselves. The contract was theirs ; it was an additional security in case of the non-arrival of the cargoes ; and though *Cruden* was

liable to the appellants, the respondents were also liable, when the contingency to make them so happened.

There are cases in which a court of chancery will not dissolve an injunction, until all the defendants have answered; but those are cases, where the defendants have an identity of interests, and where the act of one will affect the other. In the present case, I have already stated, that there is not an identity of interests between the appellants and *Cruden*; the answer of the latter could never be read as evidence against the appellants. It was, therefore, improper to restrain the appellants by an injunction, from availing themselves of a legal remedy they acquired in a due course of law, until *Cruden's* answer came in. I am, therefore, of opinion, that the order appealed from ought to be reversed.

KENT, Ch. J. declared himself to be of the same opinion.

The majority of the court being of the same opinion, it was thereupon ORDERED, ADJUDGED and DECREED, that the order of the court of chancery complained of, be reversed; and that the complainants' bill in the said cause, be dismissed with costs; and that the record and proceedings be remitted to the court of chancery, to be executed according to law.

*Judgment reversed.*