[S.C., Cooke, 420.]
This cause having come on to be heard upon the bill, answer, depositions and other evidence, and having been beard and considered accordingly before Judge Roane and Alfred Harris, Esq., a judge specially appointed for this purpose, the latter gave the opinion of the two as follows: As a complete statement of this cause has been given in the opinion heretofore declared, Cooke, 421, and as the cause is familiar to the bar. I do not deem it necessary to go into a statement of it. It occurs to me that this ease divides itself into *Page 306 
the three following propositions; viz. 1st, Ought the judgment in Pennsylvania, if the facts of this case were then known, to have been rendered in the way in which it has been rendered; or ought the present defendants to have recovered in that court any thing against the complainant? 2d. Is the record of the judgment in Pennsylvania conclusive, or will it under the circumstances of this case preclude an investigation into the original cause of action? 3d. Has there been such a full and fair trial in this case, as, according to correct principles, will preclude the Court from granting relief, c. 4th. Can this court grant any relief by way of bill quia timet against the judgment of another State where that judgment is not put in suit in this State.
As regards the first proposition, it does occur very forcibly to me from the testimony now disclosed, that if the same had been produced upon the original trial in Pennsylvania, the defendants ought not to have recovered one cent of the complainant.
The conversation which took place between complainant and defendants in the presence of Capt. John Gordon, goes a great way in proving that the house of Jackson and Evans offered to receive the certificate as a payment for the goods purchased by Winchester in February, 1794, for which the judgment hereinbefore referred to was recovered. Evans asked the complainant if he intended to purchase any goods that season; upon which complainant replied that he would not unless he could pay for them with militia certificates, upon which Evans told complainant that if David Allison would say that they were good he would take them, and the witness understood the bargain to be made between complainant and Evans on these terms. Allison then lived in the city of Philadelphia, and had been paymaster of these claims. After this conversation, Capt. Gordon says he saw the defendant taking up goods in the house of the defendant, and understood that the contract which he heard *Page 307 
stipulated as aforesaid, had been executed, and that complainant was taking up said goods in pursuance thereof. From this testimony it does not occur to me, as it is stated by the defendant's counsel, that the complainant left said certificates with Allison as his agent, to collect for the use of defendants; but it would more reasonably seem to result that they were left as the property of the defendants, and to be by them collected. This construction seems the more reasonable when we reflect that the office which was kept for the payment of those claims, was at Knoxville, near seven hundred miles from Philadelphia, and not two hundred miles from the residence of the complainant. If the fact were as stated by the defendant Evans, in his answer, that rue merchandise was purchased upon the personal credit of the defendant, and not upon the credit of the certificates in the hands of Allison, what reason could there have been for the complainant having left the whole of said certificates in Philadelphia? Why did he not bring them on to Knoxville for the purpose of getting the money, and sending it on to discharge his debt? And why did he leave the letter of Jackson, acknowledging the receipt of those certificates for the use of Jackson and Evans, with Jackson and Evans and take their receipt for the same? We are also informed by several witnesses, that in the years 1793-4, the western traders were in the habit of purchasing militia certificates, and carrying them on to Philadelphia for the purpose of purchasing goods; and that the constant practice was to take a power of attorney in blank from the person who had performed the services, and filling it up with the name of the person who was to draw the money; that the house of Jackson and Evans had dealt and were then in the habit of dealing largely in this description of claims, and that their usage was invariably to receive them as payment, unless the money could not be drawn. And further, that the money mentioned in the certificates which *Page 308 
were left with Allison, was afterwards by the direction of Allison, received. This general usage, in the absence of all other proof, would furnish a presumption that the defendants were to take upon themselves the collections of claims, and that they should amount to a payment if they could be collected. It could not be presumed under this usage, that a trader, carrying claims of this description to market, would act differently from other traders, and thereby take the responsibility of collection upon himself. Indeed, in that event, there could be no motive for carrying the certificates to market, as the trader would purchase on his own personal credit; he had better leave the certificate's at home for safe-keeping and convenience of payment, and more particularly in the present case, as the defendants say they did not require the security of the certificates to induce them to credit the complainant, but that they were willing to have credited him on his own personal responsibility for any amount of merchandise which he might have required. But when we presume the statement of Capt. Gordon to be correct, no absurdities or unaccountable matters will be involved in this transaction. The complainant then will have acted as the custom was with all his countrymen to act in similar situations. And the defendants will seem to have acted towards the complainant the same way that they had in some instances acted towards those who had purchased goods of them with militia claim.
Again, if the defendants were not to take upon themselves the responsibility of collecting the certificates in this case, as they did in others, what reason was there for requiring that Allison should judge them? If, as Evans in his answer states, the credit of the complainant was sufficient without those certificates, and they sold on that credit, it would seem a very useless, indeed an idle business, to call on Allison to judge them. For what purpose was he to judge them? Merely out of idle curiosity? Surely not. *Page 309 
Was it for the satisfaction of Gen. Winchester? It is not Gen. Winchester who wants them adjudged, but Messrs. Jackson and Evans. Why do they want them adjudged? Not that they are afraid to trust the complainant; because they tell in their answer that they were willing to have credited Gen. Winchester independent of his certificates, for any thing he might want. What motive, then, had the defendants to require that Allison should adjudge those certificates, if he was not to receive them in the payment of goods in the usual way? I can see none. But suppose the contract was as stated in the complainant's bill, that the defendants were to receive certificates in payment of goods in the usual way, then we find without difficulty a motive for their conduct. There are other circumstances disclosed in the evidence which go to show what the defendants received the certificates in the usual way — such as receiving Allison's letter and receipting for the same; not calling on complainant for the money until Allison was insolvent, and at least a year after the expiration of the credit on which they allege complainant bought the goods, and charging the same in their books to David Allison.
The next inquiry is, Were said certificates genuine? And could they have been collected? The testimony is conclusive that they were afterwards collected at the instance of Allison. This, then, I consider as payment. But suppose said certificates were not left with Allison by the consent of the defendants, or agreed by them to be received in payment of said goods. I am still of opinion that the defendants ought not to have recovered their judgment against the complainant in Philadelphia. It appears, from testimony before the Court, that in the month of April, 1794, David Allison purchased of Samuel Jackson his interest in the house of Jackson and Evans, and the business was subsequently carried on under the firm of John B. Evans 
Co. It does not in the general *Page 310 
necessarily follow when an individual purchases the interest of a partner in a mercantile house that he is entitled to the collection of that partner's portion of debts owing the house. But upon this occasion I have no question but this was the contract between Allison and Jackson. I am inclined to this opinion on account of the acknowledgments of Jackson that he has no interest in the debt claimed of the Winchesters, and of a letter by John B. Evans in the month of September, 1794, after the dissolution of the partnership of Jackson and Evans, signed John B. Evans Co., addressed to John Somerville, in which John B. Evans apprises Mr. Somerville of the dissolution of the partnership of Jackson and Evans, and notifies him of the now firm of John B. Evans Co., and requests that a balance which said Somerville was owing the late house of Jackson and Evans should be paid to the firm of John B. Evans Co. This acknowledgment of Jackson and statement of Evans, the partner interested in the record, certainly shows that Allison was entitled to the benefit of all the debts which were owing to the house of Jackson and Evans at the time he became a partner. If this then be the case, and Allison has received the money mentioned in the certificates, as is amply proven, there is no question but that this amounts to a discharge of the debt. 1 Wash., 79, 225; 2 Wash., 282; 2 H. Bl., 340. But it is objected by the counsel for the defendants, that the answer of Jackson to a bill exhibited against him and Evans by this complainant in the Federal Court, relative to this same matter, ought not to be received in evidence to prejudice the right of Evans, nor ought any admissions or statements which he has made on the subject be received, alleging that at the time said answer was filed, and acknowledgments made, Jackson was not a partner with Evans, and had no interest in the matter in dispute, and, as a general rule, the admissions or answers of a disinterested person are not to affect *Page 311 
the interest of another. It is observable that this fact, assigned as a reason for rejecting Jackson's answer, amounts to an admission of Allison's right to recover Jackson's part of the debts owing to the late house of Jackson and Evans. For how does it happen that Jackson is not interested, as his counsel say? To whom had he sold his interest? We all know that it was to Allison. But we do not think it correct that the circumstance of Jackson, having ceased to be a partner, will afford a legal ground for rejecting his answer or admissions as to any facts relative to the partnership concern which happened during the existence of that firm. Term Rep., 383; Peake's Ev., 58; 7 Term Rep., 662; 2 Gould. Esp. N. P., 449. These cases go fully to establish the preceding position; and a different construction would be unreasonable. If the fact about which a contract arises is one in which partners are jointly interested, it is certain, that, during the continuance of that joint interest, the admissions of either would be evidence against the whole; ought they then, by an act of their own, to abridge the power of an individual in procuring testimony relative to his concern with them? I think not. I am therefore disposed to receive the answer of Jackson and his admissions so far as they relate to matters that happened during the partnership, as evidence not only against Jackson, but Evans also. I acknowledge the correctness of the rule laid down by the defendant's counsel, that when there are two answers filed by the same person, the last might, if the fact was that way, be used as explanatory of the first. 2 Esp. N. P., 449, 450. But we are unable to discover any thing in the second answer that explains away facts stated in the first, of the certificates having been, deposited with Allison by the consent of Jackson and Evans, and that Allison soon after purchased out the interest of Jackson in the firm, c. These facts do not seem susceptible of an explanation. They may be denied; or other facts inconsistent *Page 312 
with them may be cited; but this will be no explanation of them, and, consequently, will not do away the force of the first. I am therefore of opinion, that the debt for which the judgment, at the suit of the defendants against the complainant in Pennsylvania, was recovered, was paid by the complainant.
First, on the ground that the defendants agreed to accept militia certificates for the goods the delivery of which created the debt; and consented that said certificates should be left in the hands of David Allison, and of said certificates having been left with Allison and afterwards paid to him.
Secondly, on the ground that David Allison, in about three months after said goods were purchased and certificates left with him, became a partner in the house of Jackson and Evans by purchasing out the interest of Jackson in said house, and had afterwards, with John B. Evans, under the firm of John B. Evans Co., the right of collecting all the debts owing to the late firm of Jackson and Evans; and as the amount of Winchester's debt was received by him during the continuance of this latter firm, it amounted to a payment of Winchester's debt.
The next inquiry arising from the argument is, Is the record of the judgment in Pennsylvania conclusive? Or will it under the circumstances of this case, preclude an investigation into the original cause of action? Much has been said upon this question, but it does not, from the situation in which this cause has, by the Court, heretofore been placed, seem necessary that the Court should, on this occasion, give any opinion upon it. From the state of the pleadings and the previous steps when in this court, the collusiveness of the record is not in issue; and this brings us to the third inquiry, to-wit: Has there been such a full and fair trial in this case as, according to correct principles, will preclude this court from granting relief?
We acknowledge that where the subject-matter of *Page 313 
defence is purely legal, and such as a defendant might have availed himself of by using ordinary diligence, if he, by his negligence, fail to avail himself of this legal defence, it will furnish no grounds for relief in a court of equity. But if, on the other hand, his defence is not purely legal, or, if legal, such as was not or could not, by ordinary means, be known to him upon the trial, or if through some other uncontrollable circumstances, he was deprived of the benefit of such testimony when it was a legal defence and known to him, it will furnish a just ground for the interposition of this court. 2 Ver., 146;1 Wash., 79; 2 Wash., 36, 255; 2 Bin., 582; 1 Johnson, 555; 1 Ves. Jr., 133; 14 Ves., 31; 4 Hen. Munf., 423, 470, 491; 1 Johns. Cases in Error, 436; Sch. Lef., 201, 204; Newland, 115, 239, 490; Cases Ab., 245;2 Wash., 255; Hard., 123, 603; Cooke, 36, 175; 1 Hay., 367, 368; 4 Johns., 510, 527; 2 Ver., 325; 2 Com. Dig., 542; Cooke, 176; 7 Term Rep., 514; 1 Call, 147; 1 Wash., 36-41. The question then presents itself upon the plea of the defendants: "Was there, or might there, by the use of reasonable diligence have been a full and fair trial of this matter in the court that tried it in Philadelphia?" That the trial was fair there can be no doubt. But that it was full, there is much question. I can not believe that the result of that trial would have been the same as it now is, if this case had presented to that court the same aspect that it now does to this.
I have no doubt but the courts in Pennsylvania would relieve the complainant from the payment of this judgment if such a case was made out to them as the present. But has the complainant been negligent in the defence which he ought to have made to the suit in Pennsylvania? In order to ascertain this fact, it will be necessary to consider some of the circumstances of this case as disclosed in the testimony. The complainant lived 900 miles from the place *Page 314 
where he was sued; at the time the writ was executed upon him he procured a citation to be issued for The defendants to show cause of action; he went before the chief justice with Mr. Levy, his attorney, at which place Mr. Jackson appeared with Mr. Raul, his attorney, when David Allison, being sworn by the chief justice, declared that the debt for which tie complainant had been arrested had by the firm of Jackson and Evans been charged to him, and produced an account in the handwriting of John B. Evans to that effect; that the complainant had left militia certificates with him to the amount of the debt for the use of Jackson and Evans; and that they had been collected and paid over to the use of said house; upon which the chief justice discharged the complainant without requiring of him special bail. Some time after this Allison died and his papers were left in great confusion, insomuch that said account could not afterwards be found; upon trial, the complainant's counsel offered to proved what Allison had deposed before the chief justice; but the Court refused to receive such testimony. Here I do not think it important to enter into the inquiry whether the Court did right or not in rejecting this testimony, as the complainant had reason to believe that his attorney, who lived in Philadelphia when Allison died, would have procured the account from amongst Allison's papers which had been produced before the chief justice; but the death of Allison and loss of his papers put it out of the power of Mr. Levy to procure this testimony. These were circumstances which Winchester could not prevent, and which deprived him of important testimony which was not unreasonable for him to suppose, situated as he was would have been procured. Moreover, the answer of Jackson in the Federal Court discloses facts which were all-important to the complainant's defence; of these facts, the complainant states in his bill he was ignorant, at least of the fact of Allison having been a partner *Page 315 
in the house of John B. Evans Co. until long after the judgment was rendered in Philadelphia. Prom the correspondence which has been produced between John B. Evans and the complainant, it seems that this statement is true. This circumstance presents a quite new case from the one in Philadelphia and has been produced in a way to which the courts of that country are incompetent. Upon this ground, I think this court authorized to interpose; and I feel no question that the courts of Pennsylvania would relieve against this judgment in consequence of this discovery if the case were properly brought before them; I do not think that the complainant's defence after the death of Allison and loss of his papers, and before the discovery produced by the answer of Jackson, was a plain legal one. Somerville and Gordon, two of his most important witnesses, lived a great distance from Philadelphia, and their importance might not at that time have been known to the complainant, and, for aught that appears to the Court, was not known to him.
The only remaining injury is, can this court, by way of bill quiatimet, relieve against the judgment of another State when that judgment is not attempted to be enforced in our country? I have been unable to find any precedent of the like kind; but think, upon principle, that when the parties are within the jurisdiction of the Court, relief may be afforded. The principle upon which courts have gone in granting relief against a legal liability is to prevent one person from oppressing another, and to interfere so as to remove the danger from, and quiet the fears of, the person thus situated, by destroying the power which his antagonist has to injure him. It is true, this Court can not decree that the record shall be given up, but it can render its decree effectual by compelling Jackson to release this judgment. This will not be doing more than I conceive the courts of Pennsylvania would do, if this case were before them; and I am convinced *Page 316 
that this court would relieve against a judgment of their own courts under these circumstances.